Thank you, Chief Justice Kuczynski, and may it please the Court. Scott Morton on behalf of the appellant, Mr. Davis. Mr. Davis was denied the right to register to vote in the plebiscite election concerning Guam's continuing relationship with the United States. The denial of the right to register was a concrete and sufficient injury for Article III purposes when he was denied the right to register. And therefore, he has standing and the case is ripe for review on the merits. The district court's judgment should accordingly be reversed. There are a number of Supreme Court decisions in the aftermath of Reconstruction dealing with denial of the right to register to vote on behalf of the race. Well, before we get there, what evidence do I have in the record that the plebiscite will ever occur? Well, there's actually a statutory provision. There's a statutory provision that suggests after a certain period of and certain acts have happened that it will occur. But what evidence do I have that those acts will happen? Beyond the statutory requirement, I don't believe there is any. Well, but the statutory requirement doesn't say there will be one. It says there will be one if certain acts happen, correct? Once 70 percent of eligible voters are registered. And if 70 percent never register, there will never be one, right? Under the statute? Under the statute, it's not entirely clear. There's a separate provision about specifying the election will occur after an educational campaign. But taking it as given that if 70 percent never register, then barring a change in law, the election wouldn't occur. Isn't that what the district judge was kind of concerned about? Yes, Your Honor. The district judge's concern was because it wasn't clear when the plebiscite would occur, therefore, in her view, the case was not right or Mr. Davis lacked standing. There are two principal problems with that analysis. The first is that the Supreme Court's decisions in this area concerning the registration for voting treat the injury not as the voting itself, but the denial of equal treatment in connection with registration. But don't you, in order to make that argument, have to suggest that this is a vote at all? I mean, it isn't going to be an election, is it? It'll be a plebiscite, and I think in the common dictionary definition of the term election, it is. Under the Voting Rights Act, I think it would be considered a proposition. But more importantly, this Court's decision in Hussey v. City of Portland dealt with what it means to be a vote. And in that case, the city was obtaining consents to annexation in lieu of going through an election process. Even there, even when there was no formal vote, because it was in using the official election machinery of the state as an alternative to that, the Court said that was a vote. Well, but that isn't exactly what's happening here. What's happening here is they are going, when 70% of them register, there will be a plebiscite, and then nothing necessarily happens except, as I understand it, it's kind of like an opinion poll for data collection, and then sent to the appropriate people. But that's about all. No change, no election, nobody gets to be, to serve, nobody does anything different. There's just an opinion poll put together that's sent then to the appropriate people. Sure. As an initial matter, we would dispute that this is not binding. The statute by its terms requires the decolonization commission to transmit the results to Congress. But even putting that aside and assuming, as Guam argues, that this is truly non-binding, the Court's decision in Hussey-Gilchrist, the decolonization commission to transmit the results to Congress following the plebiscite. But even ignoring that issue, the Court's decision in Hussey v. City of Portland is, again, on point. In that case, the ultimate annexation decision was vested in a state commission, not within those people who either would vote for annexation or would give consent in lieu of voting. And so in that case, similarly to Guam's argument here, the city resisted the application of standards for voting on the theory that it doesn't enact a law or elect someone to a particular office. And the Court rejected that. Instead, the only issue is whether the vote represents, quote, the official expression of an elector's will. And that's exactly what this plebiscite does. The voters are given three options regarding Guam's future relationship with the United States. And the outcome of the election represents the will of the electors regarding that relationship. Our position is simply that the electors are unconstitutionally constrained and their registration is limited on impermissible grounds. But there's no doubt that what is being expressed through this vote is the will of those who are allowed to vote. Well, I'm, you're, I'm a little, the district court held that because there's no election in sight, that there's, you haven't been aggrieved yet, you have no real complaint, if your complaint is that you're not going to be allowed to vote in the election. Your complaint is couched in terms of not being allowed to register. Not in terms of voting. That's correct, Your Honor. I was simply responding to Judge Smith's question. Yeah, I understand. I'm asking a different question. But I agree that what is at issue here is registration for voting. And again, in at least four Supreme Court decisions, Wynne, Lane v. Wilson, Raines, and Louisiana v. United States, the Supreme Court has adjudicated challenges to racial discrimination in registration independent of when a vote may occur. But in all of those cases, it was registration for a vote that everybody knew was going to take place. Possibly. The Supreme Court's opinion isn't clear. I assume it was. Yeah. But the point is that the Supreme Court didn't rely on that as a basis for a decision. Okay. Well, let me just answer the question, the factual question that I wanted to answer to, which is, is this registration going on now as a place where your client could go to register if he were in the proper category? My understanding is that it is. He has, of course, attempted to register, and that form is in the record. Okay. It's ER-130. He was unable to complete the form to certify that he was a native inhabitant because he doesn't meet that ancestry-based definition. But to get to another point about the nature of the injury here, I've already mentioned the Supreme Court's decisions in the voting context. But more generally, the Supreme Court and this Court have treated stigmatization based on race as a sufficient injury for Article III purposes. And for that, I'd cite the court to the Catholic League decision. Now, Guam... And for that, you don't need an election or voting or anything else. It's just enough that somebody's treated differently by their government based on race. That's correct, Your Honor. It's just a straight legal protection argument. Yes, Your Honor. And if you get through the door with that, then you're home free as far as standing is concerned. That's correct, Your Honor. And so in Catholic League, the city of San Francisco promulgated a non-binding resolution criticizing the Catholic Church's policy on adoption by same-sex couples. And it was directed particularly to the then head of the holy office. And this court nonetheless held that individual Catholics within the city of San Francisco had standing to challenge that decision or challenge the resolution because it treated them as And that's precisely what's going on here, that by being denied the ability to register solely on the basis of his not being a member of what the Guam government calls in its brief a select category of citizens, Mr. Davis is being stigmatized solely on the basis of his race. And it's interesting. In his brief, Guam says... And that case didn't involve voting. That's correct. It was, if anything... I remember it well. I wasn't sure it was right at the time, but we're run by it. It's an interesting point because under both the approach of Judge Graber's concurring opinion in the judgment and the majority opinion, which is of course now circuit law, either of those opinions would have found standing here. What Judge Graber said was that ordinary Catholics wouldn't have standing because the resolution wasn't specifically directed to them. But she acknowledged that the head of the holy office likely would have standing because it was directed to him. Here, the wrongful conduct here is specifically directed to Mr. Davis. And so, if anything, this is an easier case than Catholic League, both because the conduct is directed specifically to him and because it involves a fundamental right that the Supreme Court has previously said can be enforced, as in Lane v. Wilson, independent of denial of the right to vote itself. You have five minutes left. Perhaps once my colleagues have more questions on standing, you should speak to the merits. Sure. So, on the merits, the – Should we get to the merits, given what we have in front of us? Or should we allow, then, if we're really going to overturn the rightness and we're going to suggest there is standing, that we ought to have more briefing before the district courts really talk about the merits? Well, the parties have joined issue on the constitutional questions and the statutory questions. Guam has not raised any objection in its brief to deciding those if the court concludes that Mr. Davis has standing and the case is right. So we don't believe there would be any bar to doing so. And, frankly, we believe that once you get past the jurisdictional issues, the constitutional issues are themselves quite simple. Take the 15th Amendment as an example. That is a per se bar on discrimination in voting. As I mentioned, the Supreme Court has interpreted that to include, independently, registration for voting. And so, assuming that you conclude that this is a racial category, then it's per se invalid. And whether it's a racial category, I think the court should look to Rice v. Cayetano, where the Supreme Court held, in the context of a Hawaii racial classification, that you could have ancestry-based classifications that are proxies for race. That's exactly what's happening here. The statute says those who got U.S. citizenship by virtue of the 1950 Organic Act are eligible to vote. And that Organic Act, in turn, looks at ancestry-based qualifications tied to 1898. I guess, let me ask you this. I come from the state of Arizona, and we have a lot of educational issues and a great deal of immigration by Hispanics. Could the city of Phoenix or the state of Arizona sponsor an opinion poll of Hispanics as to whether or not they favored multilingual education? I think that's a more difficult question, for the reason that it doesn't involve the election machinery of the state. And therefore, it might not implicate, for instance, the 15th Amendment. Well, if they do the polling at the polls, it does. That sounds an awful lot like election, in which case I would treat it the same as this case. There may be more difficult cases where it's more of an informal poll. Those would involve racial classification. It would be subject to strict scrutiny. Maybe it would pass. Maybe it wouldn't. The point is that this case is quite far removed from that because it is official discrimination in voting, in the ability to register to vote. But to the extent that you must rely on this being an election, then we get back to the problem of there's no election in the office, so how are you hurt? Sure. Well, on that point, I would say that the election issue is controlled by HUSI. And if ultimately there would be an election if the 70% requirement is met, then the question is, well, what about the registration requirement? The Supreme Court said that those are just conceptually separate issues, that when you're complaining about denial of the right to register to vote, you're complaining about differential treatment, not the voting itself. And then independently, as I mentioned earlier, under Catholic League and other cases, the stigmatic injury or stigmatization injury flows independently of whether you call this a vote or registration or anything else on the site. It is being treated as an unequal member of the political community. That is a constitutional harm. And this Court has held that that is sufficient without more for Article III standing. If I look at the 15th Amendment, it seems to me that the 15th Amendment protects an election in which public issues are decided or public officials are selected, reading Terry V. Adams. If a plebiscite were held, it doesn't seem to me that public issues would be decided or that public officials would be selected. It's just a, if you will, a poll of those who the government has suggested should be allowed to give their opinion on the poll, and it's supposed to be sent to Washington, I guess, and to the United Nations. I guess I'm trying to figure out how the 15th Amendment would apply. Sure. I think at a minimum, Guam believes that this is deciding official issues for the community. On at least three separate places within the Guam Code, they characterize the plebiscite as relative to Guam's political status. Well, it may be relative, but, again, there's nothing that's decided by it. There are no public officials selected. It's simply a chance for a certain part of the Guam population to go say what they would like to do, and that to be sent to Washington and to the United Nations. But there's nothing that changes. Sure. So two responses to that. The first is what's being decided is the will of the electors.  I'm not even sure one could say it's the electors. It's those who are allowed to go register and say what they want to say. Well, by the same token, Your Honor, you could have a whites-only primary in Mississippi, where the results would be nonbinding, just to express the view of the white community about who would be the most suitable candidate for governor. It wouldn't be electing anyone to office. It wouldn't be passing legislation. It would be expressing a view of a particular community. And I was submitting a statement. And it wouldn't have one thing to say about what would happen in the election. I mean, that's the worry that I have when I look at the 15th Amendment. That's why I wanted you to talk about it. It doesn't seem to me that any public issue is decided or any public officials selected. Well, again, I would disagree about what is being or whether an issue is being decided. But I'd point this court to you. Do you think that if such a plebiscite were held that the delegate from Guam would feel bound to take actions in Washington consistent with the will expressed in the plebiscite? I would certainly expect so, Chief Judge Kaczynski. At a minimum, the Decolonization Commission would be required to transmit those results. That's an official act by the Guam government that is compelled by this. But to get back to the hypothetical I mentioned about the whites-only primary, the Supreme Court addressed that very issue in Smith v. Albright, where the primary was a prerequisite to getting on the ballot, not in the abstract, but just as a member of the Democratic Party. And so it was not electing anyone to political office, and it was not enacting laws. Now, it was expressing the views of the voters on a particular question, which is what's happening here. But the Supreme Court nonetheless held that that segregated primary was unconstitutional. And I think the same reasoning applies here. We think first that, in fact, this does have binding consequences. But even if it doesn't, it's still using the election machinery off the state. And when the state does that, it's required to do so subject to constitutional constraints, including the prohibition on racial discrimination in voting. Mr. Martin, that number in front of you is going up. That means that you are past your time. Perhaps it's time to give that aside a chance. We'll give you a little time for rebuttal. Thank you very much. Chief Judge, may I please report? My name is Rob Weinberg. I'm an assistant attorney general for the territory of Guam. So how is this not like the whites-only primary? Your Honor, I think Judge Nelson is making the point that I tried to make earlier in the briefs. Judge Smith? I'm sorry. I'm glad to be Nelson. He was prior to me in Idaho. You can call me anything, as long as you don't call me late for dinner, which is obvious. I don't think that happens very often. To answer your question, I don't think that this is, I don't think a whites-only primary, which would lead to a, which would lead then to, you know, which narrows the field for. All right, a whites-only plebiscite. So, you know, Mississippi says, you know, we want to take a view as to whether or not we should invite the Summer Olympics to Oxford, Mississippi. And, you know, what we're going to do is have a plebiscite of the white voters only because there's a majority and that's who we care and they're probably the ones who are most interested in this. And they did this. Any chance in the world that that would be upheld? I think it's self-explanatory that. No, no, just answer my question and then we can take it from there. I have to say that. You don't disagree that that would be struck down very quickly. If it was expressing the will of, if it was a statement from the government of Mississippi that that's what the government's position on it was. No, they would say we had a plebiscite and this is, you know, we want Congress to know and the U.S. Olympic Commission and the International Olympic Commission is that our white citizenry welcomes the Olympics to Oxford, Mississippi. I'm not saying anything like this has happened. Just to make it perfectly clear. But I'm just making it very specific. So any chance that that would be laughed out of court? I think it would be laughed at. Okay, so how is this different? How is this different? This is because there's a historical context here in Guam because Guam is different. The territories are different. This court, the United States Supreme Court, has recognized that territories are different. Doesn't Cayetano say not that different? I'm sorry? Doesn't Rice v. Cayetano say not that different? Rice involved, and I think Rice involved a vote for public office for statewide office of trustees. I understand. I know what it actually holds. But doesn't Rice v. Cayetano stand for the proposition that territories are not that different, that in many ways and in central respects they are treated the way the states are? I have to disagree. Rice involved the state. And, in fact, at the lower court level in Rice, the question was presented as to whether a statewide referendum on Hawaiian sovereignty. That was Hawaii, right? Right. And that was at the trial court level, and the Supreme Court expressly said, well, we're not addressing that question. Do you think Rice would have come out the other way if it had been Guam or Saipan? Yes, Your Honor, I do. Yes. Because when you're looking at states, whether it's Hawaii or Arizona, you're not looking at them. Or Puerto Rico. I'm sorry? Or Puerto Rico. Or Puerto Rico. They're not a state. They're not a state. They're a commonwealth, and they're in between. But they're also not incorporated, right? So you think Rice would have come out differently if it had been Puerto Rico? I think we'd have to look at it differently. We'd have to look at it differently in the context of the Insula cases. We'd have to say, well, let's look at this and who are we talking about here? We're talking about a people, and let me get back to Guam in 1949, who never had a vote. Who in 1950, Congress unilaterally declared, thou shalt be citizens of the United States. Now, in any legitimate form of government, everybody will agree that it is the consent of the governed. That legitimizes that government. In 1950, when Guam's Organic Act came into, when Congress wrote the Organic Act, passed the Organic Act for Guam, and made those people living here at this time, at that time citizens, they didn't get to vote. There wasn't a plebiscite. There wasn't any mutuality of consent of the governed. And I think all that this plebiscite does- I'm not sure I understand your point at all. You mean they didn't have a consent in becoming a territory, becoming U.S. citizens? This was something granted to them by Congress. Correct. Normally, there's never been a territory in the history of the United States where they had gotten to vote whether or not they- This was Congress's decision. What Congress does, it looks to places that are not the United States, and then grants them territorial status, and eventually, perhaps, grants statehood. I disagree. I don't know how the consent of those in the territories makes any difference whatsoever. I mean, Arizona was the last state admitted to the Union in the continental United States. It was 1912? 1912. 1912. February 14th. Is it a big celebration? It should be. But Arizona went through the incorporated territories. Did the- I'm sorry? Arizona would have gone through the incorporated territory approach in which Arizona would have sought entry as a state. So there was- it was willfully- Arizona willfully became a state. We're not talking about- Did it willfully become a territory is the question. I don't think it had a choice in that. There we go. Not anymore than does Guam. I mean, people in prospective territories don't get a vote because they're not part of the body politic. At the territorial level. That's correct. And we look back at- I just don't know how that helps you because there are lots of states out there that are former territories. Yes. And eventually, you could say, well, all those people have descendants who, at some point, were members of the pre-territory. They're descendants now of people that were around before it was a territory. Do they get- can the states just do a prototype based on those descendants? I don't believe so, no. And I don't think- and that's not what's happening here either. Here we are- all we're doing is we are transmitting the desires of the people and their descendants. Of some people based on race, right? You don't dispute that it's race. I do have to disagree with that. I don't think we've ever conceded that it's- I know the Supreme Court has said ancestry can be a proxy for race, but factually we haven't answered the complaint and I think we would- I already agree that it's not disputing that point. Am I mistaken about that? We have to concede it for purposes of a motion to dismiss, but we haven't conceded it for future purposes. No, but we're assuming. We assume it, yes. We assume it. But it's for the- as I understand it, it's for the purposes of the standing and rightness arguments, but not for the merits at all. Yes. Yes. As of now, we're about- yes. Because you haven't even answered the complaint. That's correct.  I've actually jumped- at the trial court level, I actually jumped past, jumped right over rightness and wanted to get to injury. And I think- and the governor's office is here and the legislature is here and we'd like to get to the- we'd like to get to the rightness. But I don't think- or the actual question of, you know, can we do this? How can we do this? How do you transmit the desires of the people who have been so assimilated? We have 170,000 people more or less in Guam now, of which I think it's 30,000-37,000 can trace their ancestry back to the people who predated in 1898 here. So they have become so assimilated they don't have a voice. And I don't think that the Voting Rights Act or the 15th Amendment- We call that the melting pot. It's not a bad thing. It was a melting pot. It's a good thing. It was a melting pot. We're also proud of that in the United States. I'm equally proud of it, Your Honor, too, for several reasons. Well, I meant you. I mean us. I meant to include all your citizens. Yes. It's a point of pride that we have a melting pot. It was a melting pot about 20 years ago. But the politically correct thing nowadays is that we're a salad of some type, in which case I think it's okay to ask- We're not chicken soup, perhaps? Not chicken soup. You've got to skim the fat. Well, I want to understand your position here. Are you not defending the district court's decision that the case is not right? No, I have to defend it, Your Honor, because I cannot confer jurisdiction on that court or this court here by consent. Well, we're not bound by it, but we can certainly hear what you say, and you have a position. And if your position is the case is right, we may not be bound by it. If that's your position, just skip over it, and we can get to the merits. If that's what you want to do. I can't in good conscience do that, Your Honor. There are too many conditions precedent to this- Precedent. Precedent. Thank you. There are too many conditions precedent to this becoming anywhere close to it. And I hate to say this on behalf of- Well, what is the holdup here? Yeah. I don't know. You know, we can look at what happened. You know, in 1996, it was one thing. In 1997, it was another. In 2000, it transmuted, I think, in light of the Rice case, which came out that year. It has transmuted again. Guam has recently lost a great champion of this. Ben Paglino, the senator, has recently died. We have an election coming up. We have people coming from the past that may bring this to the forefront. It doesn't sound like there's ever going to be an election or this is ever going to happen. I don't see it happening anytime soon, of course. Well, why does it matter? Why does it matter? The fact of denial of registration is happening now. Because in every case cited by Mr. Davis, every case involved an actual-either it was a self-executing initiative or it was a public office that people were voting for their representative to get into office. Here, we're taking a poll. We're saying, if you had an opportunity to vote, what would your choice be? And it's not even really-I mean, I don't even necessarily- And some get to express a view and others don't. And we're not going to sort of line people up and have lists, and either you get on the list depending on your ancestry or your race or you don't. Why isn't the injury here now when Mr. Davis gets turned away from registration, whereas his neighbors are allowed to register? Because this is a discreet population that has a discreet voice. And to include the voice of everybody would assimilate it to the point that it has no voice anymore. There's nothing to prevent Mr. Davis from opposing this and campaigning against it and doing everything-exercising his First Amendment rights in all ways possible. Unlike some of the cases that he cites where there was actually a- I'm sorry, are you guys going to pay for it? No. You're paying for this other thing using his tax dollars, right? Yes. You think that works? I mean, you think we can do that? I do. We can say we're going to sort of poll all the white people in California, but we don't care about anybody else. And if you want to express the view of the Hispanic community or the Mexican-American community, who's your own poll? You think that would float? I think it has to be conditioned on the fact that it goes back to the fact that this is a territory, a subject of the insular cases. California was a territory not so long ago, 1848. And before that, it was Spain or it was Mexico, right? And I don't know California history, but I assume that everybody at the time that it became a state got to vote, got to vote. Everybody, regardless of their nationality. We're not at that point yet. This goes back to the rightness problem. We're not at a point where we're transmitting the desires. The opposing counsel has referenced that. This is the desires of the electorate as though that was Guam as a whole. It's not. What's the point of doing it? Because it starts the conversation. It starts the conversation that we've been trying to have since 1996, if not earlier, which is why isn't that? If people want to have a conversation, let them go out and converse. They can have their own polls. They can have their own commissions. They can have their own groups, and they can talk to each other. Why does the government have to take sides, take the voice of some people based on their ancestry and ignore why does the voice of some get sent to the U.S. Congress and the U.N., whereas the voice of others, they have to do it on their own? Because we don't know what the answer is yet. Because as we've seen, it's taken 17, 18 years to even try and get this to this point here. And maybe if we knew what the answer is, maybe who knows? Who knows if everybody who fits this description and we had the plebiscite, they might all say, well, we want to take it. Or they might say one thing or another, and it may just end the discussion. But at least the government will know where to go. That's the least satisfactory answer to any question I've heard all day. I'm sorry, Your Honor. Because we don't know the answers, why we're going to do this thing. There's a discriminatory to get a discriminatory answer. Wow, that's really – let's try this. Is there any better answer than that? Because I don't think it's unconstitutional to ask a question. You don't think it's unconstitutional to say we'll ask a question of only the white people? It's similar. State of California says, you know, Mississippi or Wisconsin, just any state in the union, they say, you know, we're going to have a plebiscite, we're only going to ask the whites. Because we don't know what the answer is. The answer could be, don't worry about it. And in that case, we don't have a problem. I would tie the response to that to saying, what are we looking at? Are we looking at an office? Are we looking at a statement of governmental policy? Or are we just looking at it as a stepping stone to future discussion? That's the only way you can look at the statute. Okay, let's say it's a stepping stone to future discussion. Okay, so let's say that's what it is. But we're only going to poll the whites. If you're not white, we'll turn away the polls at the registration. We'll just say, thank you, we don't care what you think. So, you know, we're fond of the respect, we like you, we think you're great, you're great, but we just don't care about this for this poll. We're only going to poll the whites. And it's not binding, it's just a matter of open up future discussion. You think that's okay? Now we're getting to the question of the merits. And we're asking the question. You posed the question. You answered by saying it depends if it's one of these things. And I gave you the thing that you said. It depends if it's a case. So it no longer depends on that. On the merits of the question of asking the people who were here and their descendants in 1950, if they had a chance to vote, what would your vote be? I think a constitutionally compelling argument can be made, and I said so in the brief. I said that the insular cases, the cases like Wobble versus Villacruz, the cases like Sakamoto, the cases like, you know, that we have a responsibility. Now the court may disagree, but I think we have representatives of government here that we have a responsibility to the various populations here to keep moving this question forward. Since 1898, the promises have been made to the residents of Guam and have been ignored. You could ask the question and get separate answers from the separate groups and say everybody gets asked the question, but we'll classify you by group. I mean, I don't know whether that would be okay or not. We care, you know, but we want to see what everybody thinks. But to say we don't care what you think, you know, we don't care. No, I don't think that that's true either. I don't think it's a fair statement of what this is at this time. You can see why Mr. Davis might think that. Might think that when, you know, they have a poll and I go to register and you say go home, they probably don't care what I think. That's probably what he thinks, isn't it? I can't speak for his sensibilities. I know what the statute says. It's not ostracizing him. It's not singling him out like in the Catholic League case where Catholics and their doctrine are being, you know, they're just saying, hey, we want to hear from you right now. Is it conceivable to you that this might have been acceptable, more acceptable in terms of population strains in 1950 than it is now? I'm sorry, say that again. Might this have been more acceptable constitutionally in terms of looking at different, at the views of a particular population strain? I think that's the phrase that you used. That this might have been constitutional in 1950 when the status of Guam changed than it is now, when it's as we're down the road toward the melting pot. It may well have been, but that was, you know, we have 60 years of equal protection of jurisprudence since then that, you know, even in the last 20 or 30 years, that informs our judgment on that kind of thing. What I don't want to lose sight of, if we were to ever get to the merits, is that the insular cases and the cases involving the territories do make us different, do make the territories different. I'm not saying we're accepted from the 15th Amendment or the 14th or the voting rights. Well, the Organic Act specifically says you're not, right? It's not even debatable because with my statute, the Organic Act says those amendments are. It does, and that gets back to the question of what are we voting on? We are merely using the election machinery of the state, right? And I don't think we can just exalt form over substance and say, well, it looks like we're using the voting moves. Ergo, the Voting Rights Act has to apply. Why is that form of the substance when you use the machinery of the election machinery of the state? Why isn't that substance? Because it doesn't change the political status of anything, and it doesn't affect anybody's political rights. Well, Ted, talk to me about that. Do you really think that if there were a vote as proposed, and those who qualify voted by 80% or 90% for one of the three choices, I'm not even going to say which one it is, but overwhelmingly came out in favor of one of the three choices, do you think that that would not change the political reality on the ground? That would not change the political reality in Congress? That would not change what's the delegate from Guam, what position she took in terms of her dealings with other members of Congress? Unquestionably, it would not. Unquestionably, it would not? Not, because it is defined. Do you think she would come back and get reelected after going contrary to that vote? I'm sorry? You think she would come back and stand for election after saying, there's 80% vote in favor of this position, I took the opposite position in Congress, and I want to get reelected. You think that would happen? But that delegate represents everybody from Guam. No, I'm just saying. You think the elected officials in the state would not take that into account? It would be something that they would not consider? Who would not consider? The elected officials. I just focus on the delegate, but the governor, the attorney general, you know. I think we could and we should. How then does it not change the political reality? You say it doesn't change the political reality. How does it not change the political reality when, in fact, the elected officials look at that and have it taken into account? You know, I'm not saying anything wrong with it. They are elected officials, after all. It would demonstrate that for once in the last, you know, 30 years or 20 years, that there is some sort of uniformity in vote, that there is a groundswell of support, at least in this select population, that needs to be addressed or looked at. Okay, thank you. Thank you, Your Honor. Mr. Martin, you went over, but so did your opponent. We'll give you two minutes for rebuttal, if you would choose to take it. Thank you, Your Honor. You know, cases are often lost in rebuttal, but you decide. Thank you. I just have four very brief points that I will make. The first is the government's position that Guam is different in a constitutional sense is inconsistent with the Organic Act, including the Mink Amendment. We cite the provisions in our brief, Section 1421B, three separate provisions, ban racial discrimination. So it's simply no answer to say that Guam is different in this sense. The second point is that in response to Guam's argument that every case we cite involved binding elections, we've already discussed the stigma cases, which weren't voting cases at all, and then Lane v. Wilson, which makes clear that the issue is not the vote itself, but the denial of registration. And then the last point that I'd like to make is that the argument that this is not a statement from the government of Guam, but instead polls of select people, is false for at least two reasons. One, because that's not what the statute repeatedly says. It says that it's about Guam's political future, not those of a select people. And then the second problem with that argument is that when you invoke the election machinery of the state, as the Supreme Court and Courts of Appeals cases have repeatedly made clear, you aren't allowed to segregate people based on impermissible grounds like race or ancestry. So for those reasons, unless the Court has any further questions, we'd ask that the judgments of the district court be reversed. Thank you. KJ's argument will stand submitted. Thank you, counsel, for a very interesting and informative argument.
judges: KOZINSKI, SCHROEDER, SMITH